IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

REGINALD W. PERKINS,              §
                                  §
         Petitioner,              §
                                  §
VS.                               §   NO. 4:06-CV-687-A
                                  §
NATHANIEL QUARTERMAN,             §
Director, Texas Department        §
of Criminal Justice,              §
Institutional Division,           §
                                  §
         Respondent.              §

MEMORANDUM OPINION
and
ORDER

     Came on for consideration the petition for writ of habeas

corpus ("petition")[1] filed by Reginald W. Perkins ("Perkins"), an

inmate in the Texas Department of Criminal Justice, Institutional

Division, who is under sentence of death.  The court has

determined that the petition should be denied for the reasons set

forth in this memorandum opinion and order.

I.

Procedural History

     On March 4 2002, Perkins was convicted of capital murder by

a jury in the 371st Judicial District Court of Tarrant County.

On March 22, 2002, pursuant to the jury's answers to the special

issues set forth in Texas Code of Criminal Procedure Article

37.071, §§ 2(b) and (e), the trial judge sentenced Perkins to

---

[1]While the undersigned recognizes that 28 U.S.C. § 2254 contemplates the
filing of an "application" for writ of habeas corpus, the practice of the
Northern District of Texas has long been instead to use the term "petition."
Consistent with this now ingrained practice, the undersigned refers to
Perkins's application under 28 U.S.C. § 2254 for writ of habeas corpus as the
"petition" and uses the term "petitioner" in lieu of "applicant."

death.  On June 30, 2004, the Texas Court of Criminal Appeals
affirmed Perkins's conviction on direct appeal.  <u>See</u> <u>Perkins v.</u>
<u>State</u>, No. 74,318 (Tex. Crim. App. June 30, 2004), <u>cert.</u> <u>denied</u>,
543 U.S. 1164 (2005).

On December 22, 2003, Perkins initiated state-habeas
proceedings in the convicting court.  After holding an
evidentiary hearing on Perkins's claims of ineffective assistance
of counsel and mental retardation, the trial court entered
findings of fact and conclusions of law recommending that state-
habeas relief be denied.  On September 13, 2006, the Texas Court
of Criminal Appeals adopted the trial court's findings and
conclusions and denied Perkins habeas relief.  <u>See</u> <u>Ex parte</u>
<u>Perkins</u>, No. WR-64,354-01, 2006 WL 2615535 (Tex. Crim. App. Sept.
13, 2006).  The instant federal-habeas petition ensued.

II.

<u>Underlying Facts</u>

A.   <u>The State's Evidence at Trial</u>

Gertie and Willie Perkins were married for forty-five years.
39 Tr[2] at 25, 111.  They had two children together, Rickey and
Shirley.  <u>Id.</u> at 25, 111-12.  Willie had other children,
including Perkins, from a previous marriage.  <u>Id.</u> at 31-32, 111.
Perkins lived at times with Gertie and Willie and other times
with his mother in Ohio.  <u>Id.</u> at 32-34.

---

[2]A copy of Perkins's state-court records was forwarded to the court on
October 10, 2006.  The "TR." reference is to the court reporter's record of
the transcribed, state-trial proceedings.  Citations to "Tr." are preceded by
volume number and followed by the relevant page number(s).

In the 1970's, Willie and Gertie started a dump truck business.  39 Tr at 23-24, 28.  They operated the business from their house.  Id. at 105-06.  They both drove the dump trucks, and Gertie ran the business side of things.  Id. at 23, 28-29, 105-06.  Rickey ran a similar business.  Id. at 57.

Perkins moved in with Gertie and Willie in 2000.  39 Tr at 56-57, 103-04.  They loaned him money initially, but stopped after a while.  Id. at 58-59, 113-14.  Gertie and Willie gave Perkins a job with their trucking business and then Rickey gave him a job.  Id. at 57-58, 107-09, 120, 130-31.  Perkins later moved in with his girlfriend, Traci, and her children.  Id. at 162.

On December 3, 2000, Perkins's sister, Marilyn, called him to chat and see how he was doing.  39 Tr. at 134-35, 145.  He told her that he was having money problems and that he was worried that Traci was going to kick him out.  Id. at 135, 146.  Marilyn advised him to get a second job if he needed more money.  Id. at 135-36, 146.

Perkins also expressed concerns about money to LaSonja, Rickey's wife.  39 Tr. at 119, 126-128.  She testified that he accompanied her and Rickey to put in a bid on a job on Friday, December 1st.  Id. at 121, 129.  While Rickey was inside conducting business, she and Perkins waited outside in the company truck.  Id. at 126, 129-30.  Perkins told her that he needed a thousand dollars by Monday to get some stuff out of layaway for Traci and her kids.  Id. at 127.  He told her that,

on Monday, he was planning on robbing a lady who works by herself at a store.  <u>Id.</u>  When LaSonja told him that he was crazy and that stores had video cameras, he told her he would throw the camera away and there would be no evidence.  <u>Id.</u> at 127-28.

Between 8:00 and 8:30 a.m. on December 4, 2000, Perkins arrived at the home of Eula Lewis, who was a friend of Gertie's. 40 Tr. at 10-14.  From there, he called Gertie.  39 Tr. at 197-99, 202-03; 40 Tr. at 13-18, 21.  After using the phone, he told Eula that he was going to the park across from her house to see if someone would pick him up to take him to work.  40 Tr. at 16-17.  A short time later, Gertie called and asked about the earlier call.  <u>Id.</u> at 18.  Eula told her that Perkins had called for her to pick him up to go to work and had left to wait in the park.  <u>Id.</u> at 18-20.

Later that morning, around 9:30 a.m., Michelle Echols called Gertie about getting some medical authorization forms notarized. 40 Tr. at 34-36.  Michelle asked if she could come pick her up so they could go see the notary.  Gertie seemed troubled and told her, "Michelle, I'll call you back.  Let me get this boy off my chest and I'll call you back."  <u>Id.</u> at 38-40.  When Gertie did not call back, Michelle called again but no one answered.  <u>Id.</u> at 40-42.  Other phone calls to the house went unanswered.  <u>Id.</u> at 67-70.

At 10:58 a.m. that day, Perkins went to a pawn shop and sold Gertie's wedding ring for $150.  40 Tr. at 112-14, 118-19.  A short while later, he picked up Sedrick Gipson, a crack user.

4

Id. at 200-02, 253-55; 41 Tr. at 26-27, 38-39.  He told him he would pay him if he would cash two company checks for him.  39 Tr. at 102, 143, 155; 40 at 203-204.  Sedrick agreed.  40 Tr. at 202-03.  Perkins then gave Sedrick two checks written on the Perkins's dump truck business for $600 and $700 and Sedrick cashed them.  39 Tr. at 102, 143, 155; 40 Tr. at 90-94, 130-36, 204-07, 227-29.  Perkins gave Sedrick $200 for cashing the checks.  40 Tr. at 206-07.

Sometime after 12:45 p.m., Perkins went to the Fort Worth police station and signed a log-in sheet to see Detective Scott Campbell.  40 Tr. at 180-82.  He wrote 9:00 a.m. as his sign-in time.  Id. at 182.  Detective Campbell was in his office that day but did not have an appointment to see Perkins and was not notified that Perkins was there to see him.  Id. at 183-84.  Just before 1:00 p.m., applicant called Traci.  39 Tr. at 168-69.  He told her he was downtown at a detective's office.  Id. at 174.

About an hour later, Perkins called Traci again and asked if she would come pick him up.  She said take a cab.  39 Tr. at 174.  Perkins did and showed up at Traci's office around 3:00 p.m.  Id. at 175; 40 Tr. at 82, 98, 101-03.  He paid the cab driver with a brand-new $20 bill.  40 Tr. at 102.

Perkins came to Traci's office and threw some money on her desk.  39 Tr. at 175, 187; 40 Tr. at 80-81, 85.  Traci told him she did not want his money.  39 Tr. at 175; 40 Tr. at 85.  One of Traci's coworkers joked, however, that she would take some money if he was handing it out.  39 Tr. at 192-93; 40 Tr. at 80-81.

5

They went home around 4:45 p.m. and then went to Walmart, where Perkins gave Traci $100 to help get items for her children out of layaway.  39 Tr. at 176-77, 189.

On December 4, 2000, Willie, Gertie's husband, had been gone all day driving his dump truck.  39 Tr. at 59-62, 115.  That afternoon, he learned that Gertie was missing when someone called to tell him that she had failed to pick up their great-grandson from school.  Id. at 62-65.  After he picked up his great-grandson, Willie went home to discover that Gertie was still not home.  Id. at 64.  Willie called his children, and they came over and called friends to try to find Gertie without success.  Id. at 64-65, 136, 147-48.  They called the police.  Id. at 68.

After the police arrived at Gertie and Willie's home, it was discovered that a rug had been removed from the living room and moved to a bedroom.  The carpet had been cut out beneath the rug. 39 Tr. at 65-67, 137; 41 Tr. at 45-47, 60; 42 Tr. at 156-57, 159. The telephone cord in the bedroom had also been disconnected.  42 Tr. at 156-57, 165-67.  The police collected the phone cord as evidence.  Id. at 197.  The police also found that the sheets from the bed were missing and they found a small blood stain.  41 Tr. at 45-46; 42 Tr. at 156-57, 165-66.

The police learned that Perkins had prior convictions for rape and attempted rape and had been a suspect in two murders in Ohio.  4 Tr. at 33-34.  LaSonja told them of his statement that he planned to rob a lady.  Id. at 89-90; 39 Tr. at 128.  Perkins

6

also had been calling Rickey and asking for a ride.  4 Tr. at 25-26.

The police arranged for Rickey to call Perkins and tell him he would come pick him up.  4 Tr. at 13, 26.  They drove to Traci's apartment first and "set up" to detain Perkins on his way to Rickey's truck.  Id. at 13, 26.  When Rickey did pull up, Perkins ran to his truck and dove in.  Id. at 14, 31.  The police pulled him from the truck and handcuffed him.  Id. at 14-15, 32. They told him they were detaining him until a detective could question him.  Id. at 15-16, 33, 136.

The police quickly learned that Perkins had not notified them of his correct address in violation of his sex offender registration requirements.  4 Tr. at 18, 29, 39-41, 54-55, 94. Detective Scott Campbell then started preparing the necessary paperwork for a warrant for Perkins's arrest.  40 Tr. at 143-44. Perkins was later taken to the police station.  4 Tr. at 19, 46.

By the next evening, the police had Sedrick in custody.  40 Tr. at 212-15; 41 Tr. at 17-19.  When Perkins saw that Sedrick was in custody, he asked to see Willie, his father.  40 Tr. at 223-24; 41 Tr. at 23, 75-76.  When Willie arrived, he told Perkins, "I sure hope you've got good news for me."  39 Tr. at 71-72.  Perkins replied, "I'm afraid not; she's dead."  Id. Perkins directed Willie and the police to a parking garage and to Gertie's car inside it.  Id. at 72-73, 95-97; 41 Tr. at 77-79. Willie asked if he could get out of the car and Perkins said, "Daddy, no, don't get out.  Don't go."  39 Tr. at 97-98.  Willie gave his car keys to the police.  Id. at 98; 41 Tr. at 91.  The

7

police found Gertie's body in the trunk.  41 Tr. at 161, 209; 42
Tr. at 176-77.  Sedrick's fingerprints were found on the
passenger-side door frame.  42 Tr. at 178, 187-88.  No other
fingerprints were found and it appeared that other parts of the
car had been wiped down.  Id. at 187-88.

An autopsy revealed that Gertie had bruises on her head and
mouth and that she had been strangled.  41 Tr. at 163-72, 217-18,
226-28.  The medical examiner was unsure of the exact ligature,
but it would have been a thin and fairly smooth object like a
cord, and it would have taken six to seven minutes of strangling
to kill her.  Id. at 182-84, 221.

While in jail for this offense, and after voir dire was
underway, Perkins confessed to Robert Buchanan, another inmate at
the jail.  41 Tr. at 242-43, 246-50, 276-79, 282; 42 Tr. at 16.
Specifically, on December 22, 2001, he told Buchanan that he was
on trial for capital murder and "that they only had a body and a
phone cord and no witnesses and they couldn't get fingerprints
off a phone cord."  41 Tr. at 246-47, 276-78.  Then, around
January 2, 2002, Perkins told Buchanan "that he fucked up when he
pawned that stupid bitch's ring" and that the ring had an
inscription in it.  Id. at 248-49, 279.  Shortly thereafter, he
told Buchanan that he had beaten the victim to death.  Id. at
249, 282; 42 Tr. at 16.  He also told Buchanan something about a
phone cord.  But Buchanan couldn't remember if applicant said he
strangled the victim with it or if he tied her up with it.  41
Tr. at 249.  He said that his motive was robbery and that he took

8

some jewelry and checks.  Id. at 250.  He also said he did not cash the checks, but another man did.  Id.

B.   The State's Evidence at Punishment

At the punishment phase, the jury heard that, in 1982, Perkins pleaded guilty to and was convicted of rape of a minor, attempted rape of a minor, and gross sexual imposition.  45 Tr. at 53-55.  Both minors were twelve-years old when Perkins attacked them.  Id. at 54, 58.  Further, in 1999, an Ohio court found by clear and convincing evidence that Perkins is a sexually oriented offender, a sexual predator, and likely to engage in the future in one or more sexually oriented offenses.  48 Tr. at 121-22.  At punishment, the state also introduced evidence implicating Perkins in the strangulation murders of two other women in Ohio, Jeri Thomas and Paula Washington.  Notably, Jeri Thomas was the mother of one of the twelve-year old girls Perkins raped, and Paula Washington was the sister of his ex-wife, Ramola Washington.

C.   Perkins's Evidence at the State-Habeas Proceeding

In connection with the state-habeas proceeding, Perkins retained a mitigation specialist who, in turn, flushed out more detail about Perkins's rough childhood.  In addition, as discussed in more detail below, Perkins's introduced evidence though which he purported to show mental retardation or, alternatively, at least diminished intelligence.

9

III.

Scope of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). Under AEDPA, the ability of federal courts to grant habeas relief to state prisoners is narrowly circumscribed:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA, § 104(3) (codified at 28 U.S.C. § 2254(d)).  AEDPA further provides:

> (e)(1)  In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

AEDPA § 104(4) (codified at 28 U.S.C. § 2254(e)(1)).

Having reviewed the petition, the response, the record, and applicable authorities, the court finds that none of Perkins's grounds has merit.

IV.

<u>Grounds for Relief</u>

Perkins urges six grounds in support of his petition.[3]  In a rearranged format, they are as follows:

<u>Ground One</u>:    Perkins's death sentence violates the Eight Amendment, because he is mentally retarded.

<u>Ground Two</u>:    Perkins was denied his Sixth Amendment right to the effective assistance of counsel, because:

    a.    Trial counsel failed to investigate and present mitigating evidence; and

    b.    Trial counsel failed to investigate and present evidence that Perkins is mentally retarded.

<u>Ground Three</u>:    The trial court violated Perkins's Fourteenth Amendment right to due process by admitting evidence of the murder of Jeri Thomas.

<u>Ground Four</u>:    The trial court violated Perkins's Fourteenth Amendment right to due process by ruling that Ramola Washington was competent to testify at the punishment phase of trial without an adequate evaluation of her competency as a witness.

<u>Ground Five</u>:    The Texas death penalty statute is unconstitutional in violation of the Fourteenth Amendment, because it places the burden of proving the mitigation special issue on the defendant rather than requiring a jury finding against the defendant under the standard of beyond a reasonable doubt.

---

[3]Although Perkins urged two separate grounds on the basis of ineffective assistance of counsel for a total of seven grounds, the court felt that it made more sense to combine those two grounds into one with two subsections. Further, as his grounds two and three respectively, Perkins urges (1) that he received ineffective assistance of counsel due to their failure to investigate and present evidence as to whether he is mentally retarded and (2) that he is, in fact, mentally retarded.  Because the court's analysis of the latter ground bears on its analysis of the former, the latter – i.e. whether Perkins is truly mentally retarded so that his execution would be unconstitutional – is discussed first.

Ground Six:     Perkins's conviction and sentence violate the
                due process clause of the Fourteenth
                Amendment, because he is actually innocent.

V.

Discussion

A.   Ground One: Mental Retardation

In Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme
Court banned the execution of the mentally retarded.  However,
"[n]ot all people who claim to be mentally retarded will be so
impaired as to fall within the range of mentally retarded
offenders about whom there is a national consensus." Atkins, 536
U.S. at 317.  The obvious challenge -- which the Supreme Court,
in turn, left to the states to meet -- is how to determine which
offenders falls within the range of mental retardation sufficient
to render a sentence of death unconstitutionally cruel.  Id.

The State of Texas used a three-part definition borrowed
from the American Association of Mental Retardation[4] and
generally codified in Section 591.003 of the Texas Health and
Safety Code.  Specifically, under this definition, "a person is
mentally retarded if he has three characteristics: (1)
'significantly subaverage general intellectual functioning' (an
IQ of about 70 or below); (2) 'related limitations in adaptive
[behavior],' and (3) onset of the above two characteristics
before age eighteen."  See Hall v. State, 160 S.W.3d 24, 36 (Tex.

---

[4]The Supreme Court cited to this definition in Atkins.  See Atkins, 536
U.S. at 308 n.3.  The State of Texas also uses this definition in death-
penalty cases.  See Ex Parte Briseno, 135 S.W.3d 1, 6-8 (Tex. Crim. App.
2004).

12

Crim. App. 2004) (citation omitted).  Although the first and
third elements are relatively self-explanatory, the second
element is perhaps not.  Adaptive behavior generally refers to
"the effectiveness with or degree to which a person meets the
standards of personal independence and social responsibility of
the person's age and cultural group."  See Tex. Health & Safety
Code. Ann. § 591.003(1) (Vernon 2003).  To state a successful
claim under Atkins, all three prongs of the definition must be
met.  See In Re Salazar, 443 F.3d 430, 432 (5th Cir. 2006).  And
it is Perkins's burden to show, by a preponderance of the
evidence, that each prong is met.  Hall, 160 S.W.3d at 38.

     In his petition and brief in support, Perkins thoroughly
reviews the voluminous evidence as to his mental capacity.  See
Perkins's Pet. for Writ of Habeas Corpus ("Perkins's Pet.") at
17-20; Br. in Support of Perkins's Pet. ("Perkins's Br.") at 19-
29.  The State does the same in its response.  See Resp't's Resp.
at 24-43.  There is no reason for the court to do so again here.
Briefly though, at least three experts tested Perkins's
intellectual functioning  -- (1) defense expert, Dr. Cunningham,
(2) the State's expert, Dr. Randall Price, and (3) a neutral
expert, picked jointly by the defense and prosecution, Dr. Paul
Andrews.[5]  Id.  The results widely varied, reflecting that

_____

     [5]Dr. Richard Garnett, a counselor, was also appointed on Perkins's
behalf, but the state court quite reasonably determined that what few opinions
Dr. Garnett offered were unreliable.  See Habeas Record at 899, ¶¶ 38-34; 936-
37.  Specifically, Dr. Garnett criticized, inter alia, the results of the so-
called WMT test indicating that Perkins was malingering.  Dr. Garnett,
however, did not himself interview Perkins, administer the WMT test, or any
other test.  In addition, he reviewed only a portion of the data compiled by

13

Perkins had an IQ of between 66 to 80.  The IQ of 66, however, was the result of testing performed by Dr. Andrews, who, in turn, opined that the result was invalid due to Perkins's lack of effort.  Further, there was testimony that the high score was a more accurate reflection of Perkins's mental capacity due to the difficulty of one faking a score higher than his real aptitude.

The evidence as to whether Perkins suffered from adaptive behavior deficits also conflicted.  Perkins's expert and certain family members testified that Perkins did suffer limitations in this area, while the State's expert and other of Perkins's family members testified that he did not.  The state court also considered evidence that Perkins had, inter alia, been employed as a truck driver of a nine-speed manual transmission dump truck, could read maps and follow directions, could repair cars, had a commercial driver's license, consistently scored well in school while in prison in Ohio, and played chess.  Further, there were the circumstances surrounding the murder of Gertie itself, which arguably reflected premeditation of Perkins's part, as well as efforts to conceal his crime, create an alibi, and blame another for his actions.

Regarding the final requisite characteristic concerning the time of onset, aside from the self-serving testimony of family members, there were was very little, if any, evidence, that any deficits in Perkins's intellectual or adaptive functioning

---

the three board-certified psychologists appointed in the case.  Moreover, he offered no opinion as to whether Perkins was mentally retarded.  Id.

manifested prior to his turning eighteen-years old.  In contrast, there was evidence that Perkins's family never acted in accordance with the belief that Perkins was mentally retarded before he turned eighteen.  Further, Perkins was never diagnosed as mentally retarded before the age of eighteen, despite the fact that he attended various schools and received medical care as a child.

In short, having independently reviewed all of the evidence, the court concludes that, while there is evidence indicative of perhaps mild mental retardation, there is ample evidence that Perkins is not mentally retarded.  Consequently, the state court's finding that Perkins is not mentally retarded was not unreasonable.  See 28 U.S.C. § 2254(d)(2).  Moreover, these findings are presumed to be correct unless controverted by Perkins with clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  Perkins has failed to meet that burden here.[6]  This ground is denied.

B.   Ground Two: Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel ground, Perkins must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceedings would have

---

[6]The court views the issue of Perkins's mental capacity as one of fact. Even if viewed as a mixed issue of fact and law, the state-court decision on this issue was not contrary to or otherwise involved an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687
(1984).  Both prongs of the <u>Strickland</u> test must be met to
demonstrate ineffective assistance.  <u>Id.</u> at 697.  To establish
the first prong, Perkins must overcome a strong presumption that
his counsels' conduct falls within the wide range of reasonable
professional assistance.  <u>Id.</u> at 689.  It is not enough to show
that some, or even most, defense lawyers would have handled the
case differently.  <u>Green v. Lynaugh</u>, 868 F.2d 176, 178 (5th Cir.
1989).  For the second prong, Perkins must show that his
counsel's errors were so serious as to "deprive him of a fair
trial, a trial whose result is reliable."  <u>Strickland</u>, 466 U.S.
at 687.[7]  Because Perkins is challenging a death sentence, the
question is whether there is a reasonable probability that,
absent the errors, the jury--including an appellate court, to the
extent it independently reweighs the evidence--would have
concluded that the balance of aggravating and mitigating
circumstances did not warrant death.  <u>Id.</u> at 695.  A reasonable
probability is a probability sufficient to undermine confidence
in the outcome.  <u>Williams v. Taylor</u>, 529 U.S. 362, 391 (2000).

    1.   <u>The contention that trial counsel failed to investigate
        and present mitigating evidence.</u>

Perkins asserts that he received ineffective assistance of
his trial counsel by their failure adequately to investigate and

---

    [7]If Perkins cannot show that the ineffectiveness of his counsel deprived
him of a substantive or procedural right to which the law entitles him, then
he must show that the result of the proceeding was fundamentally unfair or
unreliable.  <u>Williams v. Taylor</u>, 529 U.S. 362, 391-93 (2000) (discussing
<u>Lockhart v. Fretwell</u>, 506 U.S. 364 (1993), and <u>Nix v. Whiteside</u>, 475 U.S. 157
(1986)).

to present mitigation evidence at trial.  Primarily, he complains that the person who did some investigation of his background was not a "mitigation specialist."  Further, he claims that evidence of his difficult childhood should have been better investigated and presented at trial.  The court disagrees.

As an initial matter, even Perkins concedes that the retention of a mitigation specialist is not required.  <u>See</u> Perkins's Reply Br. at 2.  Further, trial counsel did use a licensed and experienced investigator to develop mitigation evidence.  Trial counsels' failure to have used a mitigation specialist thus hardly fell below an objective standard of reasonableness.  With respect to Perkins's childhood and other purported mitigating evidence not introduced at trial, this court concurs with the state court's conclusion in this regard, namely that the decision to forego a relatively weak mitigation case[8] and instead concentrate on arguing Perkins's lack of future dangerousness was objectively reasonable.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687 ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's

---

[8]According to trial counsel, Perkins hindered their investigation of mitigating factors by not cooperating and telling them he did not want his family members involved.  Resp't's Answer at 17-18.  Relying on <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005), Perkins now argues that any lack of cooperation on his part is no excuse for trial counsels' allegedly inadequate investigation of mitigating evidence.  Putting aside that the investigation was not inadequate, Perkins's reliance on <u>Rompilla</u> is misplaced.  There, the Supreme Court held that, even when a capital defendant and his family members have suggested that there is no mitigating evidence, trial counsel has a duty to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at sentencing.  <u>Rompilla</u>, 545 U.S. at 387-90.  Perkins is not accusing his trial counsel of failing to obtain that type of evidence.

17

informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment.")

Even assuming that trial counsel's investigation and presentment at trial of mitigation evidence fell below an objective standard of reasonableness, Perkins has failed to demonstrate a reasonable probability that, but for these errors, the result of the proceedings would have been different. Strickland, 466 U.S. at 687.

The mitigation evidence includes that Perkins was raised in poverty, that he was exposed to family violence, that he suffered some rough beatings by his alcoholic mother, was generally emotionally abused and neglected, and was asked by his mother to steal from a neighbor while she distracted the neighbor with sex. See Perkins's Pet. at 9-12.  These circumstances pale in comparison to those described in the opinions relied upon by Perkins in support of the prejudice prong of Strickland.  For example, in Wiggins v. Smith, 539 U.S. 510, 534-538 (2003), the Supreme Court found that the mitigating evidence that trial counsel failed to present was powerful and that the failure to properly develop and introduce it at trial was prejudicial to the defense.  In Wiggins, however, the petitioner's childhood could only be described as nightmarish.  His mother, a chronic alcoholic, frequently left the petitioner and his siblings at home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Wiggins, 539 U.S. at 516-517.  The mother beat the children for breaking into the kitchen, which she

18

often kept locked.  She had sex with men while her children slept
in the same bed and forced Wiggins's hand onto a hot stove burner
resulting in his hospitalization.  Id. at 517.  Then at age six
began petitioner's bleak journey through multiple foster homes
where he endured physical abuse, repeated sexual molestations,
and gang rape.  Id. at 517.  Further, in sharp contrast to the
numerous other violent acts of murder and rape by Perkins, in
Wiggins, the petitioner did "not have a record of violent conduct
that could have been introduced by the State to offset this
powerful narrative" of mitigation.  Id. at 537.

    In short, the mitigation evidence Perkins complains was
prejudicially absent from his trial consists primarily of him
coming from abject poverty and having an abusive mother.  That
evidence juxtaposed against Perkins's murdering his stepmother of
45 years and pawning the wedding ring his father gave her for a
mere pittance to get $100 of stiff out of layaway for his
girlfriend hardly creates a reasonable probability that, but for
the alleged errors concerning mitigation evidence, the jury would
have concluded that the balance of aggravating and mitigating
circumstances did not warrant death.  Strickland, 466 U.S. at
695.  This ground is thus denied as well.

    2.   The contention that trial counsel failed to investigate
         and present evidence that Perkins is mentally retarded.

    Trial counsel's decision not to have Perkins psychologically
tested was objectively reasonable, because Perkins did not
present to them as mentally retarded.  Further, trial counsel

19

feared that a psychological evaluation would reveal Perkins to be a sociopath, which, in turn, could hurt Perkins on the issue of future dangerousness.  Strickland, 466 U.S. at 689.  Even if the performance of trial counsel was not reasonable on this issue, the court has already concluded that Perkins is not mentally retarded such that his execution is unconstitutional under Atkins v. Virginia, 536 U.S. 304 (2002).  Consequently, Perkins cannot meet the second prong of Strickland requiring a showing of a reasonable probability that, but for his counsel's failure to investigate and present evidence on mental retardation, the jury would not have assessed the death penalty.  Strickland, 466 U.S. at 695.  Perkins also urges that, even if he is not mentally retarded, he has low intelligence and that evidence should have been presented to the jury in mitigation.  Perkins fails to meet the second prong of Strickland in this assertion too.  Evidence that Perkins had average or even less than average intelligence that does not reach the level of mental retardation when weighed against the overwhelming aggravating evidence  -- including his murder of his own stepmother and two other women and the raping of two twelve-year old girls -- was unlikely to have any effect on the jury's determination on punishment.  Strickland, 466 U.S. at 695.  Perkins's claims regarding ineffective assistance of counsel are both properly denied.

C.   Ground Three: Evidence of the Murder of Jeri Thomas

     Perkins argues that his right to due process was violated by the trial court's admission of evidence regarding the

unadjudicated murder of Jeri Thomas at punishment.  The record

clearly reflects the trial court's finding in Perkins's state-

habeas action that he failed to raise this issue on direct

appeal.  <u>See</u> Habeas Record ("HR") at 915, ¶¶ 177, 179, and 181;

936-37.  The Texas Court of Criminal Appeals subsequently adopted

all of the trial court's findings.  <u>Ex parte Perkins</u>, No. WR-

64,354-01, 2006 WL 2615535 (Tex. Crim. App. Sept. 13, 2006).

The prior finding of procedural default precludes federal-

habeas review of this ground:

> We now make it explicit: In all cases in which a state
> prisoner has defaulted his federal claims in state
> court pursuant to an independent and adequate state
> procedural rule, federal habeas review of the claims is
> barred unless the prisoner can demonstrate cause for
> the default and actual prejudice as a result of the
> alleged violation of federal law, or demonstrate that
> failure to consider the claims will result in a
> fundamental miscarriage of justice.

<u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).  Here, Perkins has

made no attempt to show cause and prejudice for his default or

that failure to consider this ground will result in a fundamental

miscarriage of justice.  Nor does it appear that he could.

Consequently, the court is satisfied that ground one should be

denied as procedurally defaulted.  <u>See</u> <u>Hughes v. Johnson</u>, 191

F.3d 607, 614 (5th Cir. 1999) (procedural-default doctrine

precludes federal habeas review when the last reasoned state-

court opinion addressing such claim explicitly rejected it on a

state-procedural ground) (citation omitted).

D.   Ground Four: Ramola Washington's Competency as a Witness

     Here, Perkins urges that his Fourteenth Amendment right to
due process was violated when the trial court ruled that Ramola
Washington, Perkins's former wife, was competent to testify at
the punishment phase of trial without an adequate evaluation of
her competency as a witness.  In the state-habeas action, the
trial court found that Perkins had failed to raise this issue on
direct appeal as well.  See HR at 913-14, ¶¶ 167-176.  Again,
Perkins has failed to demonstrate cause for his "default and
actual prejudice as a result of the alleged violation of federal
law" or that the "failure to consider the claims will result in a
fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.
Because his procedural default is thus unexcused,[9] the
procedural-default doctrine precludes federal habeas review of
this ground as well.  Hughes, 191 F.3d at 614.

E.   Ground Five: The Texas Death
     Penalty Scheme is Unconstitutional

     Next, Perkins argues that the Texas death penalty scheme is
unconstitutional, because the State is not required to prove
beyond a reasonable doubt the absence of mitigating circumstances
sufficient to warrant the imposition of a life rather than death
sentence.  In making this assertion, he relies on the Supreme

---

     [9]To the extent that Perkins attempts to suggest that the appellate
record was not sufficient to address this issue, he does so only in conclusory
fashion.  See Perkins's Br. at 34; Perkins's Reply at 14.  Moreover, Perkins
nowhere counters the State's valid assertion that, even if the record was
inadequate, that is no excuse for not raising the issue on direct appeal.  If
necessary, the appellate court could have remanded for an evidentiary hearing
on the issue.

Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000)
and Ring v. Arizona, 536 U.S. 584 (2002).

Perkins is incorrect.  Neither Apprendi nor Ring require a
mitigating factor to be proven beyond a reasonable doubt.
Rather, the issue in both cases was whether a more severe
punishment could be imposed by a trial judge after a jury found
the facts.  See Apprendi, 530 U.S. at 491-92; Ring, 536 U.S. at
597. This ground therefore fails to identify any erroneous or
unreasonable application of clearly established federal law, and
habeas relief is thus not warranted.  See 28 U.S.C. § 2254(d)(1).

F.   Ground Six: Actual Innocence

Finally, Perkins claims that his conviction and sentence
violate the due process clause of the Fourteenth Amendment,
because he is actually innocent.  However, a stand-alone claim of
actual innocence based on newly discovered evidence is not
cognizable on federal habeas review.  Rather, such a claim can
only state a ground for federal habeas relief if there is "an
independent constitutional violation occurring in the underlying
state criminal proceeding."  Herrera v. Collins, 506 U.S. 390,
400 (1993).  As discussed above, the court has found none of
Perkins's other grounds for habeas relief meritorious.
Consequently, there is no independent constitutional violation.
Even had Perkins proven an independent constitutional violation,
his claim of actual innocence would still fail, because it is
based solely on his self-serving affidavit denying his guilt.
See Perkins's Br. at 40.  This evidence is hardly sufficient to

create the requisite substantial doubt about Perkins's guilt to entertain granting Perkins any relief on this claim.  See, e.g., Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000).

VI.

Order

For the reasons discussed herein,

The court ORDERS that the petition be, and is hereby, denied.

SIGNED March 1, 2007.

_____/s/ John McBryde_____
JOHN McBRYDE
United States District Judge

24